**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-20410**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**IRIS PEREIRA, also known as IRIS GILL,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**
**(CR-H-95-2272)**
_____

October 10, 1997

Before KING, JONES, Circuit Judges, and WERLEIN, District Judge.[*]

PER CURIAM:[**]

Appellant Iris Pereira appeals her conviction after a jury trial and sentence for conspiracy to possess with intent to

_____

[*]District Judge of the Southern District of Texas, sitting by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

distribute heroin and cocaine.  Finding no reversible error below, we affirm.

## FACTUAL BACKGROUND

The evidence at trial established that on January 20, 1995, while assigned to the Drug Enforcement Task Force, New York City Police Detective George Sabando was introduced to Pereira by one of his informants, Augustine Silvestri, as being an individual with very good knowledge regarding the trafficking of cocaine and heroin in the New York City area.  Sabando testified that, at that time, he considered Pereira to be a source of information seeking to become a confidential informant.[1]  At that meeting, Sabando took Pereira's photograph, fingerprints, and personal history and filled out a cooperating individual agreement.  Sabando told her that, pursuant to this agreement, she was not allowed to negotiate any type of deal or meet with any individual to discuss a future deal without letting Sabando know first.  She could not travel out of the state to do a deal; she could not receive a sample of a controlled substance without giving them advance notice; and if she frequented a drug-prone area without telling Sabando in advance and was arrested, she would not be protected by their agreement.

---

[1]The evidence established that a "source of information" is an individual who, acting in good faith, voluntarily gives the police information and that a "confidential informant" is an individual who actually works for the police.  A source of information can become a confidential informant by giving credible information to law enforcement.

Sabando explained to Pereira that, if she notified him after the drug activity commenced, her involvement would be considered criminal activity and it would be reported to the DEA. Pereira executed the cooperating individual agreement. At this meeting, Pereira provided only general information regarding Colombian Nationals operating a drug-trafficking network in the Queens/Brooklyn area.

On February 9, 1995, Sabando had a second meeting with Pereira to introduce her to his supervisor. At this meeting, Pereira again provided only general information regarding the importation of heroin from Panama into New York City. The meeting lasted approximately 30 minutes, and the parties made no arrangements regarding future meetings.

Sabando again met with Pereira on February 24, 1995, to refingerprint her because the initial fingerprints were done on state, rather than federal, print cards. Pereira was again instructed to contact Sabando when she acquired information in order for her to be established as a reliable source.

Sabando's next contact with Pereira was a telephone call in May to inform her of his new pager number because he had lost his old pager. Then, in July, Pereira phoned Sabando, apologized for not maintaining contact with him, and explained that she had been ill.

3

On August 12, 1995, Pereira paged Sabando from Florida and indicated on the page that it was an important call by using the digits "911." Sabando returned the call and informed her that he was not happy that she had gone to Florida without first notifying him. Pereira informed him that unknown persons had entered her mother's home, and she asked him to call local law enforcement or the DEA to see what had happened. She told him that she had financial records for Sabando and hoped they had not been taken. Sabando refused her request and reminded her that she knew the conditions of their agreement and that she had not advised him before going to Florida. Sabando advised her to call local law enforcement officials and to let him know what happened. Pereira paged Sabando for a second time later that day, but he did not return her call.

On August 14, 1995, Sabando was paged from Pereira's attorney's office in Miami. Pereira's attorney stated that Pereira was present in his office and asked Sabando if the case he was working on with Pereira overlapped with her business in Miami. Pereira's attorney suggested that Sabando speak with Agent Ozolof in Miami. During the telephone call with Ozolof, Sabando learned for the first time that a wiretap had been placed on Pereira's phone in New York, and as a result, the Miami authorities had intercepted conversations indicating that Pereira was involved in drug trafficking activity. Ozolof suggested that Sabando contact

4

New York City Police Officer Paul Massimillo, the individual who obtained the court-authorized wiretap on Pereira's phone. Sabando contacted Massimillo and learned, also for the first time, that during the previous six months, Pereira had been busy arranging for couriers to smuggle controlled substances into the country from Venezuela.

On August 15, 1995, Pereira again paged Sabando from Florida. Sabando informed Pereira that the DEA in Miami was looking for her and that she must come to New York. Pereira responded that she had business to take care of in Houston, Texas. Sabando instructed Pereira not to go to Houston to conduct business and that her priority was to come to New York. Pereira traveled to Houston in spite of her discussion with Sabando.

On August 16, 1995, Pereira paged Sabando from a Motel 6 in Houston and told him that her attorney had informed her that she was wanted in Miami and that if she did not return to Miami she would be indicted. Sabando confirmed Pereira's fears that officials in Miami wanted to indict her, and he told her to return to New York so that he could finalize her paperwork.

Pereira contacted Sabando again on August 17, 1995, and asked him if he would be able to help her with the DEA if she did "a deal" in Texas. Sabando told Pereira that her priority was to return to New York, he did not want her in Houston, he did not authorize her to go to Houston, and she had called him after the

5

fact in contravention of their agreement. Pereira refused to provide Sabando with any information regarding the deal in Texas. The conversation ended abruptly when someone knocked on the motel room door. Sabando was informed later that day that Pereira had been arrested.

United States Customs Service Special Agent Dennis Lorton testified that on August 1, 1995, he was notified that two confidential informants were on board a freighter in possession of heroin and cocaine. Lorton monitored the freighter which arrived in Houston on August 13, 1995. He, along with DEA agents and Houston Police Department Officers, met the informants on board the freighter and took possession of two rectangular packages of heroin, six packages of cocaine, and scraps of paper and business cards with the names and telephone numbers of the contacts to whom the informants were supposed to deliver the drugs. Later that evening, the agents instructed the informants to contact "Rudolfo," one of the individuals listed on the scraps of paper retrieved from the informants. Lorton testified that Rudolfo advised the informant to call an individual named "Martha," who was staying at a local Motel 6. Martha was later identified as Pereira. The agents established surveillance on the room and then contacted "Martha."

The informant had three telephone conversations with "Martha," all of which were recorded. Summarized, the telephone

transcripts reflect that the informant asked "Martha" whether she had the money. "Martha" stated that she had to call Rudolfo and instructed the informant to call her back. When the informant returned her call, "Martha" stated that she was unable to reach Rudolfo, but the informant could come to the hotel and talk about the transaction. "Martha" informed the informant that she did not have the money with her at the room, but that the money could be wired to him at the local Western Union. "Martha" and the informant ultimately agreed to meet to conduct the transaction in person.

The next day, Rudolfo arrived in Houston and went to Pereira's hotel room. The informant contacted Rudolfo at the hotel, and they agreed that the informant would bring the drugs to the hotel to make the exchange. The informants were taken to the hotel in a taxi cab driven by an undercover Houston Police Officer. When the informants arrived at the hotel, Pereira paid the cab fare and escorted the informants inside the hotel room. Although the informants were wearing body wires, the atmosphere noise in the hotel room was very loud and the surveillance team was unable to hear any dialog. The undercover officer driving the cab returned to the hotel room under the pretense of returning a bag which one of the informants left in the cab. Pereira opened the door and the undercover officer observed the drugs and the money inside the

7

room. The officer gave a signal, and the surveillance team effected the arrest.

The officers recovered $15,000 and the eight packages of drugs the informants brought to the scene. The officers also recovered two digital pagers, three or four temporary phone cards, a piece of paper with the name of the dock where the freighter arrived, airline tickets, and a piece of paper containing George Sabando's office and pager numbers from Pereira.

Ralph Saldivar, a latent print examiner with the Houston Police Department, testified that an analysis of one of the packages of drugs confiscated at the hotel revealed two of Pereira's fingerprints. Lorton testified that upon arrest, Pereira stated that she worked for Sabando at the DEA in New York.

Pereira was charged in a two-count indictment with conspiracy to possess with intent to distribute heroin and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), and 846, and with aiding and abetting the possession with intent to distribute heroin and cocaine, in violation of 18 U.S.C. §§ 2, 21. She was convicted after a jury trial of conspiracy to possess with intent to distribute heroin and cocaine; she was acquitted of the aiding and abetting count. The court sentenced Pereira to 188 months, five years supervised release, a $10,000 fine, and a $50 special assessment.

Pereira appeals complaining that (1) the district court erred in admitting evidence of other crimes, (2) the evidence was insufficient to support her conviction, (3) the jury's verdict convicting her of conspiracy was legally inconsistent with its verdict of acquittal on the aiding and abetting count, and (4) the district court erred in calculating her base offense level.

**DISCUSSION**

**A.   Evidence of Other Crimes**

Pereira first argues that the district court abused its discretion in admitting under FED. R. EVID. 404(b) evidence of two uncharged incidents implicating her in drug trafficking activity. She argues that the Government failed to demonstrate the relevance of the prior offenses to the instant offense and that the proffered testimony was unsubstantiated and not credible.  She also argues that the district court failed to balance the probative value of the evidence against its prejudicial effect as required by Rule 403.

This court reviews the district court's evidentiary rulings and determinations of relevance for abuse of discretion. *See United States v. Palmer,* 37 F.3d 1080, 1084 (5th Cir. 1994), *cert denied,* 514 U.S. 1087 (1995).  FED. R. EVID. 404(b) precludes the admission of evidence "of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in

9

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

We have previously held that in order to be admissible under Rule 404(b), the extrinsic-offense evidence must be relevant to an issue other than the defendant's character, must possess probative value which is not substantially outweighed by undue prejudice, and must satisfy the other requirements of FED. R. EVID. 403.[2] *See United States v. Bentley-Smith,* 2 F.3d 1368, 1377 (5th Cir. 1993). To determine whether this extrinsic evidence was relevant to an issue other than Pereira's character, the court "must address the threshold question of whether the government offered sufficient proof demonstrating that the defendant committed the alleged extrinsic offense." *United States v. Ridlehuber,* 11 F.3d 516, 522 (5th Cir. 1993).

Prior to trial, Pereira gave notice of her intent to raise the defense of public authority. "The public authority defense is available when the defendant is engaged by a government official to participate or assist in covert activity." *United*

---

[2] FED. R. EVID. 403 provides in relevant part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . .."

*States v. Spires,* 79 F.3d 464, 466 n.2 (5th Cir. 1996). Pereira asserted that her exercise of public authority occurred between January 1, 1995 and September 1, 1995. After being notified of Pereira's intent to use this defense, the Government informed Pereira of its intent to introduce evidence of two incidents implicating Pereira in drug-trafficking during the relevant period. The court allowed the Government to do so.

Regarding the first incident, DEA Special Agent Osvaldo Amaro testified at Pereira's trial that on May 18, 1995, while working in an undercover capacity, he delivered 4.5 kilograms of cocaine to Pereira in a hotel room in Miami. Amaro had been instructed to arrive at the hotel with 12 shaving cans stuffed with cocaine and deliver those cans to a female -- later identified as Pereira -- in exchange for $10,000.

Regarding the second incident, Denise Munoz testified that she was approached by Pereira, who at the time identified herself as "Martha," in July of 1995 while Munoz was working at a beauty salon in New Jersey. After their initial meeting, Pereira and Munoz had several telephone conversations in which they discussed transporting drugs into the country from Venezuela. Pereira offered to pay Munoz $8,000 if she agreed to the transaction. Munoz did in fact travel to Venezuela, with an airline ticket purchased by Pereira. She picked up a suitcase from another person in Venezuela as pre-arranged by Pereira and returned

11

to Miami.  However, immediately upon exiting the plane, Munoz was stopped and detained by a DEA agent.  Munoz agreed to cooperate with the DEA and provided the DEA with Pereira's telephone number and her contact person in New York.

Massimillo testified that, while investigating a suspected drug trafficker Jorge Emilio Torres, he discovered that Torres was frequently in contact with Pereira.  On July 21, 1995, Massimillo obtained the court-authorized wiretap on Pereira's home telephone in New York which intercepted a call from Pereira to Munoz in which Pereira instructed Munoz to travel to Venezuela and pick up the heroin.

Sabando testified that prior to Pereira's arrest on August 17, 1995, and in violation of any agreement he may have had with her, he had no knowledge of Pereira's involvement with 4.5 kilograms of cocaine on May 18, 1995 and that, prior to August 14, 1995, he had no knowledge of Pereira's involvement in recruiting Munoz to import heroin from Venezuela.

The evidence of Pereira's prior acts during the period in which she maintains she was acting under actual or believed public authority was probative evidence of Pereira's state of mind when she conspired to distribute and possess with the intent to distribute cocaine and is relevant to rebutting her public authority defense.  The testimony of Agent Amaro that Pereira orchestrated the delivery of cocaine in Miami and the testimony

12

from Munoz and Massimillo that Pereira orchestrated the delivery of heroin from Venezuela to Miami were sufficient proof of the extrinsic acts and were relevant to Pereira's intent to distribute cocaine and heroin in the Houston offense. The prejudice caused by the admission of this testimony does not substantially outweigh its probative value. The district court did not abuse its discretion in admitting this evidence.

### B. Sufficiency of the Evidence

Pereira next challenges the sufficiency of the evidence to support her conviction. We review a challenge to the sufficiency of the evidence to determine whether, when viewing the evidence in the light most favorable to the jury's verdict, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Sotelo,* 97 F.3d 782, 789 (5th Cir. 1996), *cert. denied,* ___ U.S. ___, 117 S.Ct. 1002 (1997). To prove a conspiracy under 21 U.S.C. § 846, the Government is required to prove (1) an agreement between two or more persons to violate the narcotics laws; (2) a defendant's knowledge of the agreement; and (3) her voluntary participation in that agreement. *See United States v. Misher,* 99 F.3d 664, 667 (5th Cir. 1996), *petition for cert. filed,* 65 U.S.L.W. (1997). "[A] jury may infer each element of a conspiracy from circumstantial evidence: 'an agreement to violate narcotic laws may be inferred

13

from concert of action.'" *Id.* at 668 (quoting *United States v. Cardenas,* 9 F.3d 1139, 1157 (5th Cir. 1993)).

The evidence presented at trial established that Pereira was actively involved in orchestrating the delivery of the drugs between Rudolfo Pierre and the informants. Pereira's defense that she was acting under an actual or believed public authority was refuted by Sabando's testimony that he was unaware of Pereira's involvement in the two drug-trafficking offenses in Miami and that he instructed her not to continue the drug deal in Houston. In viewing the evidence in the light most favorable to the jury's verdict, the evidence is sufficient to prove beyond a reasonable doubt that Pereira knowingly conspired to possess cocaine and heroin with the intent to distribute it.

## C. Inconsistency of the Verdict

Pereira next contends that her acquittal for aiding an abetting the possession with intent to distribute heroin and cocaine requires the reversal of her conviction for conspiracy to possess with intent to distribute heroin and cocaine because the jury rendered a legally inconsistent verdict.

However, "it is well established that juries are entitled to render inconsistent verdicts." *United States v. Parks,* 68 F.3d 860, 865 (5th Cir. 1995), *cert. denied,* 116 S. Ct. 825 (1996). In a multiple-count indictment, "even if the counts were overlapping,

14

the law does not require consistency of verdict between the separate counts.  Inconsistent verdicts may simply be a reflection of the jury's leniency." United States v. Peña, 949 F.2d 751, 755 (5th Cir. 1991) (citations omitted).  We affirm on this issue.

### D.  Sentencing

### 1.  Appropriate Quantity of Drugs Attributable to Pereira

Pereira contends that the district court erred during sentencing in calculating the amount of cocaine and heroin attributable to her.  She argues that the district court should have considered only the 1,290 grams of heroin and the 2,477 grams of cocaine seized as a result of her arrest in Houston in determining her base offense level and that the court impermissibly included the amount of drugs seized in the two prior Miami offenses.  She argues that evidence regarding the amount of drugs seized in the two prior offenses was based on information obtained from unreliable cooperating government witnesses and that it was not independently corroborated, did not bear indicia of reliability, and that the two prior offenses were outside the scope of her relevant conduct.

We review a sentencing court's application of the sentencing guidelines *de novo. See United States v. Edwards,* 65 F.3d 430, 432 (5th Cir. 1995).  We review the district court's calculation of the quantity of drugs involved for sentencing

15

purposes for clear error. *See United States v. Mergerson,* 4 F.3d 337, 345 (5th Cir. 1993), *cert. denied,* 510 U.S. 1198 (1994).

"[A] defendant's base offense level for the offense of conviction must be determined on the basis of all `relevant conduct' as defined in U.S.S.G. § 1B1.3." *United States v. Vital,* 68 F.3d 114, 117 (5th Cir. 1995); U.S.S.G. § 2D1.1 comment. n.12. Relevant conduct may include quantities of drugs not specified in the count of conviction if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction. *See United States v. Bryant,* 991 F.2d 171, 177 (5th Cir. 1993); *United States v. Edwards,* 911 F.2d 1031, 1033 (5th Cir. 1990) (noting that the sentencing court may consider a broad range of conduct and is not limited to conduct from the offense of conviction); U.S.S.G. § 1B1.3, comment. (backg'd) ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.").

Two or more offenses "constitute part of a common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi."* U.S.S.G. § 1B1.3 comment. (n.9(A)). Two or more offenses involve the "same course of conduct . . . if they are sufficiently connected or

16

related to each other as to warrant the conclusion that they are part of a single episode, spree, or *ongoing series of offenses*." U.S.S.G. § 1B1.3 comment. (n.9(B)) (emphasis added).

"In determining drug quantities, the district court may rely on any evidence which has a 'sufficient indicia of reliability.'" *United States v. Sherrod,* 964 F.2d 1501, 1508 (5th Cir.), *cert. denied,* 506 U.S. 1041 (1992). The PSR is considered reliable evidence for sentencing purposes. *See Vital,* 68 F.3d at 120. A district court may adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence. *See United States v. Puig-Infante,* 19 F.3d 929, 943 (5th Cir.), *cert. denied,* 613 U.S. 864 (1994).

In addition to the fact that the Miami offenses and the instant offense had a common purpose, there is significant temporal proximity among them. The Miami offenses occurred within four months of the offense for which Pereira was convicted. *See United States v. Bethley,* 973 F.2d 396, 401 (5th Cir. 1992) (relevant conduct taking place within six months of the count of conviction met the temporal proximity test), *cert. denied,* 507 U.S. 935 (1993); *see also United States v. Moore,* 927 F.2d 825, 827-28 (5th Cir.) (activities occurring in January and June of the same year considered part of "common scheme or plan"), *cert. denied,* 502 U.S.

17

871 (1991). Pereira did not present any evidence to refute the probation officer's calculation of the relevant quantity of drugs involved in those transactions for sentencing purposes. The district court did not commit clear error by including quantities of drugs from the two Miami transactions in its calculation of Pereira's base offense level.

## 2. Supervisory Role Pursuant to § 3B1.1(c)

Pereira also argues that the district court erred in awarding a two-level enhancement for her role in the offense under § 3B1.1(c). She argues that the enhancement was based on information obtained from an unreliable cooperating government witness, that it was not independently corroborated, and that it did not bear an indicia of reliability.

We review a district court's determination that a defendant held a supervisory role in an offense under U.S.S.G. § 3B1.1 for clear error. *See United States v. Musquiz,* 45 F.3d 927, 932-33 (5th Cir.), *cert. denied,* ___ U.S. ___, 116 S.Ct. 54 (1995). Factual findings are not clearly erroneous if they are plausible in light of the record read as a whole. *See United States v. Ayala,* 47 F.3d 688, 689-90 (5th Cir. 1995).

The guidelines provide that a defendant's base offense level is to be increased by two levels if the defendant was "an organizer, leader, manager, or supervisor in any criminal

18

activity." U.S.S.G. § 3B1.1(c). Proof that the defendant supervised only one other culpable participant is sufficient to make the defendant eligible for this enhancement. *See United States v. Washington,* 44 F.3d 1271, 1281 (5th Cir.), *cert. denied,* 514 U.S. 1132 (1995). Such an increase is based on the defendant's role and conduct encompassed within the scope of the offense of conviction and any relevant conduct. *See United States v. Eastland,* 989 F.2d 760, 769 & n.18 (5th Cir.), *cert. denied,* 510 U.S. 890 (1993). The enhancement is proper only if the defendant organized, led, managed, or supervised at least one other person who was criminally culpable in, though not necessarily convicted for, the offense. *See United States v. Valencia,* 44 F.3d 269, 272 (5th Cir. 1995); § 3B1.1, comment., (n.2). If the defendant objects to the increase in his offense level, the Government must establish facts to support the adjustment by a preponderance of the relevant and sufficiently reliable evidence. *See United States v. Elwood,* 999 F.2d 814, 817 (5th Cir. 1993).

Pereira filed written objections to the PSR, contesting the facts supporting the recommendation for a § 3B1.1(c)) increase. The district court awarded the two-level increase under § 3B1.1(c), finding that the evidence at trial showed that Pereira recruited Munoz to transport drugs from Venezuela to Miami. The intercepted telephone conversations confirmed that Pereira instructed Munoz to

19

travel to Venezuela, pick up the heroin, and travel back to Miami with an airline ticket purchased by Pereira. The district court did not clearly err in determining, based on the record read as a whole, that Pereira held a supervisory role sufficient to warrant a two-level increase pursuant to § 3B1.1.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of conviction and sentence of the district court.